**JENNER & BLOCK LLP**
KENNETH K. LEE (Cal. Bar No.: 264296)
klee@jenner.com
DANIEL D. WELSH (Cal. Bar No.: 288904)
dwelsh@jenner.com
633 W. 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone:   213 239-5100
Facsimile:   213 239-5199

**JENNER & BLOCK LLP**
PETER J. BRENNAN (*pro hac vice*)
pbrennan@jenner.com
JONATHAN A. ENFIELD (*pro hac vice*)
jenfield@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312 222-9350
Facsimile:   312 527-0484

Counsel for Defendant Nissan North America, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| JOSHUA RAFOFSKY and JOSHUA IRON WING, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>NISSAN NORTH AMERICA, INC., a California corporation,<br><br>     Defendant. | Case No. 2:15-CV-01848 AB (MANx)<br><br>**[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW FOR NISSAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing:  Feb. 27, 2017, 10:00 a.m.<br>Hon. André Birotte, Jr.<br>Courtroom 7B, 1st St.<br><br>Complaint Filed: March 12, 2015 |

## **TABLE OF CONTENTS**

I. **Statement of Uncontroverted Facts** ................................................................ 1

    A. The Q50—Sales ............................................................................................ 1

    B. The Q50—Features ...................................................................................... 1

    C. Customer Sentiment Regarding The Apps' Availability. ........................... 4

    D. Enrolling For And Using The Apps. .......................................................... 4

    E. Plaintiff Joshua Rafofsky ........................................................................... 7

    F. Plaintiff Joshua Iron Wing ......................................................................... 10

    G. Nissan's Representations About InTouch. ................................................. 12

    H. New Vehicle Limited Warranty ................................................................. 16

    I. Dr. Calder's Report .................................................................................... 16

II. **Conclusions of Law** ....................................................................................... 19

    A. Summary Judgment Standard And Burdens. ............................................ 19

    B. App Enrollment And Usage Data. ............................................................. 20

    C. Relationship Between Named Plaintiffs' Claims And Class Claims. ........ 20

    D. Nissan Did Not Breach Any Contract. ...................................................... 21

    E. Nissan Did Not Violate the NDTPA. ......................................................... 22

    F. Plaintiffs Have No Claims As To Facebook, Google Search, Email, Or Calendar. .................................................................................................... 22

    G. Summary Judgment To Nissan Is Proper On Plaintiffs' Class Claims. ..... 22

    H. Non-Human and Non-Household Customers Have No Claims Under the CLRA. ........................................................................................................ 24

    I. Plaintiffs May Not Seek CLRA Damages. ................................................ 24

    J. Injunctive And Declaratory Relief Would Not Be Proper. ........................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................20

*Cattie v. Wal-Mart Stores, Inc.*,
504 F. Supp. 2d 939 (S.D. Cal. 2007) .......................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).............................................................................19, 20

*F.T.C. v. Stefanchik*,
559 F.3d 924 (9th Cir. 2009) .....................................................................20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*,
528 U.S. 167 (2000)...................................................................................24

*Gest v. Bradbury*,
443 F.3d 1177 (9th Cir. 2006) ...................................................................24

*Herremans v. BMW of North America, LLC*,
2014 WL 5017843, at *6 (C.D. Cal. Oct. 3, 2014) ...................................21

*Houston v. Medtronic, Inc.*,
957 F. Supp. 2d 1166 (C.D. Cal. 2013) ...............................................22, 23

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) ....................................................................23

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
No. 13-CV-01180-BLF, 2014 WL 4774611 (N.D. Cal. Sept. 22, 2014).................20

*Mazur v. eBay Inc.*,
257 F.R.D. 563 (N.D. Cal. 2009)...............................................................24

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) .........................................................20, 22, 23

*Netbula, LLC v. BindView Dev. Corp.*,
516 F. Supp. 2d 1137. (N.D. Cal. 2007).....................................................21

**ii**

*Picus v. Wal-Mart Stores, Inc.*,
　256 F.R.D. 651 (D. Nev. 2009) ....................................................21, 22, 23

*Scovil v. Medtronic Inc.*,
　No. 2:14-CV-00213-APG, 2015 WL 880614 (D. Nev. Mar. 2, 2015) ..............22, 23

*Simon v. Bank of Am., N.A.*,
　No. 10-CV-00300-GMN-LRL, 2010 WL 2609436 (D. Nev. June 23, 2010) .......................................................................................................22

*Tyson Foods, Inc. v. Bouaphakeo*,
　136 S. Ct. 1036 (2016) (Roberts, C.J., concurring)............................................23, 24

*Wilson v. KRD Trucking W.*,
　No. 2:10-CV-00163-KJD, 2012 WL 1900941 (D. Nev. May 24, 2012) .................21

**STATUTES**

Cal. Bus. & Prof. Code § 17200, *et seq.*, California Unfair Competition
　Law ("UCL") .............................................................................................22, 23

Cal. Civ. Code § 1750, *et seq.*, California Consumers Legal Remedies Act
　("CLRA").....................................................................................................22, 23

Cal. Civ. Code § 1761 .................................................................................................24

Cal. Civ. Code § 1782.................................................................................................24

Cal. Com. Code § 2201(1) ..........................................................................................21

N.R.S. § 104.2201 ......................................................................................................21

N.R.S. § 104A.2201 ...................................................................................................21

N.R.S. § 598.0915 ......................................................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(e) ..................................................................................................20

Fed. R. Civ. P. 56(a) ..................................................................................................19

Defendant Nissan North America, Inc. ("Nissan") respectfully submits to the Court these proposed uncontroverted facts and conclusions of law in support of Nissan's Motion for Partial Summary Judgment.  Nissan requests that the Court find the following facts uncontroverted and make the conclusions of law as set forth below.

In this document Nissan uses the term "the Apps" to refer specifically to the software applications at issue in this lawsuit: Facebook, Google Search, Pandora, iHeartRadio, Email, and Calendar.  Nissan uses the term "InTouch Apps" to refer to the broader set of apps that includes but is not limited to the Apps.

## I.   Statement of Uncontroverted Facts

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| **A.   The Q50—Sales** | |
| **1.**      Nissan began selling and leasing the Infiniti Q50 sedan to the public in August 2013. | Ex. 15,[1] Q50 Nationwide Sales & Leases, July 2015, at 2; Compl. ¶ 3. |
| **2.**      In the United States, 55% of Q50s were sold or leased on or after February 1, 2014.  38% of Q50s were sold or leased on or after June 1, 2014.  18% of Q50s were sold or leased on or after October 1, 2014. | Ex. 15 at 2-3. |
| **3.**      As of October 26, 2016, 7,845 Q50s had been sold or leased in California (7,316 excluding fleet sales), and 284 had been sold or leased in Nevada (258 excluding fleet sales). | Ex. 16, Q50 Cal., Nev., and Ill. Sales and Leases, Oct. 26, 2016, at 1. |
| **B.   The Q50—Features** | |
| **4.**      One of the Q50's standard features is an infotainment | Ex. 2, Harless & Hoffer Decl. ("H&H |

---

[1] Unless otherwise indicated, all "Ex." citations are to the concurrently submitted Declaration of Jonathan A. Enfield in Support of Nissan North America, Inc.'s Motion for Partial Summary Judgment.

[PROPOSED] UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW                    Case No. 2:15-CV-01848 AB (MANx)

| | |
|---|---|
| system called InTouch.  InTouch comprises features such as a dual-screen touch panel display, audio system, rearview camera, and hands-free phone compatibility. | Decl."), Dec. 16, 2016, ¶ 7. |
| **5.**    InTouch's touchscreens allow users to control parts of the Q50, such as the audio and climate control systems. | H&H Decl. ¶ 7. |

### i.    The InTouch Apps, Including the At-Issue Apps

| | |
|---|---|
| **6.**    InTouch utilizes certain applications, or "apps," that are built into the system.  They do not require a smartphone to operate.  These apps include Driving Performance and Maintenance Notes, as well as Compass (for vehicles with the optional navigation system). | H&H Decl. ¶ 7. |
| **7.**    InTouch also utilizes two other kinds of apps—"S1 Apps" and "S2 Apps"—which are the subject of this suit. | H&H Decl. ¶ 7. |
| **8.**    S1 Apps are installed on the Q50 and allow users to control various Internet-based services via InTouch.  For example, the Email app allows users to synchronize and control their email (e.g., Yahoo, Gmail), and the Calendar app allows users to do the same for their electronic calendars (e.g., Google Calendar).   S2 Apps are installed on users' smartphones and are designed to be controlled via InTouch. These apps include services such as Facebook and Google Search. | H&H Decl. ¶ 7. |
| **9.**    When Nissan began selling the Q50 in August 2013, the Q50 did not have any S1 or S2 Apps available.  In the weeks directly before and after Nissan began selling the Q50, Nissan planned to make certain S1 and S2 apps available to Q50 customers after the start of sales via a free software | H&H Decl. ¶ 8; Ex. 21, Electronic Field Comm'n, Aug. 15, 2013, at 7; Ex. 3, Weisinger Decl., Dec. 19, 2016, ¶ 7. |

| | |
|---|---|
| update. | |
| **10.**   On or about the start of sales, Nissan informed prospective customers that these apps were "currently planned to be released this fall." | Ex. 24, Visor Sleeve, Oct. – Dec. 2013; Weisinger Decl. ¶ 7. |
| **11.**   In late 2013, it became apparent to Nissan that it could not release the Apps in fall 2013. | Ex. 9, Brand Dep., April 7, 2016, 135:6-7. |
| **12.**   In January 2014, Nissan began informing customers, dealers, and others that the precise release date of the Apps had "not been determined" and that Nissan would provide more information as it became available. | Ex. 29, ITB14-004, Jan. 24, 2014, at 24; Ex. 32, Electronic Field Comm'n, Feb. 19, 2004, at 1; Ex. 26, InTouch and DAS Service Campaign, Jan. 23, 2014 at 1-2. |
| **13.**   On September 24, 2014, Nissan made Facebook, Google Search, Calendar, and Email available to customers as a software update. | Ex. 34, Quick Start Guide, Sept. 2014, at 1. |
| **14.**   On July 1, 2015, Facebook chose to change its interface.  This made certain Facebook features that had been available via InTouch since September 24, 2014 unavailable for use via vehicle infotainment systems, including InTouch.  After Facebook's change to its interface, enrolled InTouch users could still use Facebook's Check In and Events features.  Since before the Q50 went on sale, Nissan had been informing customers that "[c]ertain vehicle services . . . provided by independent companies are not within Infiniti's control and are subject to change without notice or liability to Infiniti and its affiliates and agents." | Ex. 42, Decl. of Sanjay Shukla, Jan. 27, 2017, ¶¶ 2-4; Ex. 36, Email, June 26, 2015, at 1; Ex. 15 at 7; Ex. 35, InTouch Apps User Guide, c. Sept. 22, 2014. |

| | |
|---|---|
| **15.** Nissan has been unable to make Pandora and iHeartRadio available as apps on the InTouch system. However, Q50 customers with compatible smartphones can still use those services. By connecting a smartphone to InTouch, a customer can listen to audio from Pandora or iHeartRadio through the Q50's audio system. In addition, a customer can use the Q50's touchscreen or steering wheel hard buttons to play, pause, and skip songs on these services. Customers using Pandora in this manner cannot change Pandora stations or provide thumbs-up/thumbs-down feedback via the InTouch. Controlling those features requires using the connected smartphone's touchscreen. | H&H Decl. ¶ 11; Ex. 4, E. Weisinger Dep. 141:1–142:3; Weisinger Decl. ¶ 9 & Ex. 3-1, ¶ 9; Ex. 12, Rafofsky Dep., Dec. 13, 2016, 93:22-95:12. |

### C.    Customer Sentiment Regarding The Apps' Availability.

| | |
|---|---|
| **16.** Over 1,500 customers completed a survey about the Q50 in January and February 2014, when Facebook, Google Search, Calendar, and Email were not yet available for InTouch. | Ex. 7, Infiniti Q50 Early Buyer Study, Mar. 2014, at 7. |
| **17.** 7% of respondents to the January 2014 and February 2014 survey desired improvements to the InTouch Apps, including the Apps' availability. | Ex. 7 at 19. |
| **18.** Fewer than 10% of car owners regularly listen to online radio while in their cars. | Weisinger Dep. 147:18-148:3; Weisinger Decl. ¶ 14. |

### D.    Enrolling For And Using The Apps.

| | |
|---|---|
| **19.** Although InTouch is standard on all Q50s, in order to use the Apps on InTouch, a customer must take two steps. First, she must enroll online for a free Infiniti Owner Portal | H&H Decl. ¶ 7; Weisinger Decl. ¶ 8; Compl. ¶ 4. |

| | |
|---|---|
| Account. Second, a customer must download and install the free Infiniti InTouch App on her smartphone. The InTouch App is available from the Apple App store and the Google Play store. | |
| **20.** As Nissan informed its customers, taking those steps will only work if a customer has a compatible smartphone. InTouch works with iPhones and Android devices, but it does not work with Blackberries or with Microsoft Windows smartphones. | H&H Decl. ¶ 7; Ex. 34 at 1; Ex. 8, Karen Baehner Dep., May 13, 2016, 95:6-11; Weisinger Decl. ¶ 8; Ex. 37, InTouch FAQ, Nov. 9, 2016; Ex. 21 at 7. |
| **21.** A customer must also have an account or accounts with relevant third-party providers such as Google Calendar and Facebook. | H&H Decl. ¶ 7. |
| **22.** More than 80% of Q50 customers did not enroll for an Infiniti Owner Portal Account. | Weisinger Dep. 143:19-144:20, 155:4-155:6; Weisinger Decl. ¶ 11; H&H Decl. ¶ 18. |
| **23.** Across "all Nissan and Infiniti vehicles available in the United States capable of allowing customers to use smartphone apps via their vehicle infotainment systems," more than 75% of Nissan customers have never enrolled with Nissan to use those apps. For example, as of April 2016 Pandora and iHeartRadio were available on the 1,140,182 vehicles using Nissan's LCN2K and DA infotainment operating systems. Of those vehicles, only 24.3% of owners had enrolled to use those apps. | Weisinger Decl. ¶ 11; H&H Decl. ¶ 18 & Fig. 1; Ex. 6, App Enrollment & Usage, at 2-3; Ex. 5, App Availability, at 1-6; |
| **24.** As of April 2016, the Facebook app had been used | Ex. 6 at 3; Ex. 2 at |

| | |
|---|---|
| 817,999 total times on all Nissan and Infiniti vehicles. That constitutes 2.77 uses per enrolled vehicle and 0.66 uses per vehicle capable of providing Facebook. | 10 (Fig. 2); Weisinger Decl. ¶ 12. |
| 25.     As of April 2016, the Google Search app had been used 826,004 total times on all Nissan and Infiniti vehicles. That constitutes roughly 2.58 uses per enrolled vehicle and 0.61 uses per vehicle capable of providing Google Search. | Ex. 6 at 3; H&H Decl. at 10 (Fig. 2); Ex. 3, ¶ 12 & n.2. |
| 26.     As of April 2016, the Pandora app had been used 289,628 total times on all Nissan and Infiniti vehicles. That constitutes 1.05 uses per enrolled vehicle and 0.25 uses per vehicle capable of providing Pandora. | Ex. 6 at 3; H&H Decl. at 10 (Fig. 2); Weisinger Decl. ¶ 12. |
| 27.     As of April 2016, the iHeartRadio app had been used 181,903 total times on all Nissan and Infiniti vehicles. That constitutes 0.66 uses per enrolled vehicle and 0.16 uses per vehicle capable of providing iHeartRadio. | Ex. 6 at 3; H&H Decl. at 10 (Fig. 2); Weisinger Decl. ¶ 12. |
| 28.     At his May 4, 2016 deposition, Nissan Manager of Cross Carline Product Planning Eric Weisinger answered questions by counsel for Nissan regarding the levels of app enrollment and usage by Nissan customers. Plaintiffs' counsel did not ask Mr. Weisinger any questions on those topics. | Weisinger Dep. 142:12-144:20. |
| 29.     On June 15, 2016, Nissan produced to Plaintiffs the spreadsheets regarding app enrollment and usage that Mr. Weisinger references in his declaration. The spreadsheets have the following beginning Bates numbers: NNAZe-0058330, NNAZe-0058331, and NNAZe-0058332. | Weisinger Decl. ¶¶ 11-13 & ¶ 11 n.1; Pls.' Cert. Reply, Jan. 23, 2017, Dkt. No. 88-1, at 13:8-9. |
| 30.     The Marketing Initiatives document Bates-stamped | Enfield Decl. ¶ 18; Ex. 1, Calder |

| | |
|---|---|
| NNAZe-0058510 (Ex. 17) was produced to Plaintiffs on July 11, 2016. Plaintiffs used it in support of their class certification memorandum as Ex. 2, and Dr. Calder reviewed it and cited it in his expert report. | Report, Nov. 17, 2016, ¶¶ 7-8 & Ex. B. |
| **31.** The plaintiff in the related *Zingerman* action did not serve Nissan with any documents requests regarding app enrollment or usage. Plaintiffs in this matter have not served any document requests separate from the *Zingerman* plaintiff's. | Ex. 14, L. Zingerman, D.D.S., P.C., RFPs. |
| **32.** The parties to this action and to the *Zingerman* action agreed to allow 15 total depositions per party in this action and *Zingerman* combined. Plaintiffs took a combined total of 10 depositions. | Joint 26(f) Report, Dkt. No. 42, at 6:5-10; Pls.' Cert. Reply 13:6-7. |
| **E. Plaintiff Joshua Rafofsky** | |
| **33.** On September 21, 2013, Joshua Rafofsky leased a Q50 from Glendale Infiniti of Glendale, California for his Q50. The lease agreement does not mention InTouch or the Apps. The lease expired on December 21, 2016. At the time he signed the lease, Mr. Rafofsky lived in California. | Rafofsky Dep. 25:1-2, 37:14-21; Ex. 39, Rafofsky Lease Agreement, Sept. 21, 2013, at JR-0017. |
| **34.** Prior to leasing the vehicle, Mr. Rafofsky visited Glendale Infiniti a handful of times. Mr. Rafofsky does not recall visiting any other Infiniti dealership. His first visit was in roughly June 2013. He testified that he remembered visiting Glendale Infiniti again in roughly July 2013 for a Q50 promotional event before the Q50 was available for lease or purchase. He may have visited the dealership one or two other times before September 21, 2013 (when he returned to | Rafofsky Dep. 53:10-16, 55:4-10, 55:11-24, 56:18-57:2, 64:22-65:5, 65:6-7, 66:14-67-2. |

| | |
|---|---|
| the dealership to sign the lease), but he is not sure. | |
| **35.**     Between Mr. Rafofsky's visit to Glendale Infiniti for the promotional event and his signing the lease on September 21, 2013, Glendale Infiniti employees—particularly salesman Danny Geris—repeatedly contacted Mr. Rafofsky to discuss the Q50, but those contacts focused on procedural details of a potential lease and did not involve InTouch or the Apps.  To the extent that any of his interactions with dealership employees touched on the Q50's features, Mr. Rafofsky took their comments "with a grain of salt because [he] knew that they were salespeople." | Rafofsky Dep. 81:12-82:15. |
| **36.**     Mr. Rafofsky testified that he believed that the text messages and phone calls from Glendale Infiniti salesperson Danny Geris were not part of any uniform directive from Nissan to its dealers and instead were undertaken at Mr. Geris's own initiative. | Rafofsky Dep. 80:11-16. |
| **37.**     Mr. Rafofsky testified that the following sources of information were relevant to his decision to lease his Q50: (1) a brochure or pamphlet that he saw at the dealership in roughly June and July 2013; (2) a video advertisement that he saw either on television or on the Internet, likely sometime between July and September 2013; (3) information in a display stand that contained the brochure/pamphlet that he saw in roughly June and July 2013; (4) a page on an Infiniti website that he likely saw sometime between July and September 2013.  Mr. Rafofsky testified that he did not remember any other representations by Nissan about InTouch | Rafofsky Dep. 62:25-64:5, 66:2-16, 67:3-68:4, 68:19-20, 72:23-76:9. |

| | |
|---|---|
| being relevant to his decision to lease the car. | |
| **38.**  Mr. Rafofsky did not take a copy of the brochure/pamphlet that he saw at the dealership in roughly June and July 2013 and does not have a copy of it.  He does not have copies of the display stand or video advertisement. A screen grab that Mr. Rafofsky took of the Infiniti web page is attached to the Enfield Declaration as Exhibit 19.   The screen grab references the Apps, listing Email and Calendar as "Coming Soon."  Mr. Rafofsky testified that he saw this web page before leasing the car and no earlier than July 2013, but could not remember the exact date. | Rafofsky Dep. 13:16-14:7, 60:11-21, 61:1-3, 68:5-7; Ex. 19, Screen Grab, at 1. |
| **39.**   Mr. Rafofsky testified that he remembered that the brochure/pamphlet mentioned InTouch. | Rafofsky Dep. 63:4-7. |
| **40.**   Mr. Rafofsky testified that he remembered that the video advertisement discussed InTouch in connection with the topics of "world of connection, smartphone apps, app ecosystem, [and] smart car." | Rafofsky Dep. 63:8-19. |
| **41.**   Mr. Rafofsky testified that he had no interest in Email, Calendar, or Google Search and never planned to use them via InTouch. | Rafofsky Dep. 113:25-114:13; Ex. 13, Rafofsky Interrog. Resps., Nov. 9, 2016, Nos. 10 & 13. |
| **42.**   Mr. Rafofsky did not remember seeing the InTouch-related visor sleeve that is attached to the Enfield Declaration as Exhibit 24. | Rafofsky Dep. 74:24-75:4. |
| **43.**   Mr. Rafofsky did not contact anyone from Nissan in connection with his decision to lease the Q50.  Nobody from Nissan contacted Mr. Rafofsky about the Q50 prior to the | Rafofsky Dep. 88:4-25. |

**9**

| | |
|---|---|
| lease's start date. | |
| **44.**   Mr. Rafofsky knew that the Apps were not available when he leased the Q50 on September 21, 2013.   He testified that prior to leasing the vehicle he was never given a specific date as to when the Apps would be available.   Mr. Rafofsky testified that he saw a statement regarding fall 2013 availability for the Apps in connection with the web page that he saw before leasing the Q50 (*see supra* ¶ 38) but that he could not remember the exact wording.   He testified that at the time he leased the vehicle he was unsure exactly when he expected the Apps would be available but believed that it would one to six months after the date of his lease.   He testified that that estimate was "an assumption [he] made just based on . . . what [he] had seen from Infiniti and the [dealership] employees [he] spoke to."   In roughly January 2014, Mr. Rafofsky asked his salesperson at Glendale Infiniti when the Apps would be available, and the salesperson said they would be available in six months to a year. | Rafofsky Dep. 62:12-24, 160:21-23, 161:2-13, 161:21-22, |

### F.    Plaintiff Joshua Iron Wing

| | |
|---|---|
| **45.**   On November 11, 2013, Mr. Iron Wing leased his Q50 from Park Place Infiniti in Las Vegas, Nevada.   The lease agreement does not mention InTouch or the Apps.   Mr. Iron Wing's lease will expire in February 2017.   Mr. Iron Wing lived in Nevada when he signed his lease. | Ex. 11, Iron Wing Dep., Nov. 18, 2016, 13:8-11, 14:1-4, 37:7-21; Ex. 40, Iron Wing Lease Agreement, at 1-2. |
| **46.**   Prior to leasing his Q50, Mr. Iron Wing had approximately 8-12 conversations with employees at Park Place Infiniti.   He testified that at least some of those | Iron Wing Dep. 31:20-32:23, 52:20-53:3; 62:13-18, 65:18-66:8, 66:23- |

| | |
|---|---|
| conversations touched on InTouch and its features: the system's start-up and processing time; the Q50's back-up camera and its predictive parking lines; and planned software updates that would supply the Apps and make other improvements, including the timing of those updates. | 68:4, 79:6-9, 159:11-25. |
| 47.    Mr. Iron Wing testified that his conversations with Park Place Infiniti employees were important to his decision to lease the Q50 and probably the most important source of information of his understanding of InTouch generally and the Apps specifically: "I think the sales pitch [from dealership employees], and then the, actually having somebody telling you and talking to you about it.  I think that would be true to most sales pitches and going in and actually seeing and having them tell you something." | Iron Wing Dep. 108:8-109:8. |
| 48.    Mr. Iron Wing testified that he could not tell whether his conversations with Park Place Infiniti salespeople were scripted in part or in whole. | Iron Wing Dep. 75:5-11. |
| 49.    Mr. Iron Wing testified that before leasing his Q50 he saw something about InTouch on a Nissan web page or pages, possibly a simulation of the InTouch system.  He testified that he did not remember exactly what he saw.  He testified that he also saw information about the Q50 and possibly information about InTouch on third-party websites but was not sure which sites or what they said.  He testified that he could not remember which information he saw on Nissan's website and which he saw on unaffiliated websites. | Iron Wing Dep. 78:5-79:2, 85:9-13, 87:15-21. |
| 50.    Mr. Iron Wing testified that he could not remember | Iron Wing Dep. 87:2-25. |

| | |
|---|---|
| with certainty having seen any representations by Nissan about InTouch or the Apps in addition to what he saw on the Internet as described in Paragraph 49. | |
| **51.**    Mr. Iron Wing testified that before leasing his Q50 he might have seen a television advertisement for the Q50 but could not remember whether it mentioned InTouch. | Iron Wing Dep. 64:12-19, 85:14-16, 156:11-157:1. |
| **52.**    Mr. Iron Wing testified that before leasing his Q50 he might have seen one or more magazine advertisements for the Q50 but was not sure and could not remember whether any such advertisements actually mentioned InTouch. | Iron Wing Dep. 64:20-65:1, 156:11-157:1. |
| **53.**    Mr. Iron Wing testified that he may have seen or taken a brochure for the Q50 but could not remember. | Iron Wing Dep. 77:23-78:4, 88:10-15. |
| **54.**    Mr. Iron Wing did not contact anyone from Nissan in connection with his decision to lease the Q50.  Nobody from Nissan contacted Mr. Rafofsky about the Q50 prior to the lease's start date. | Iron Wing Dep. 34:1-9, 89:11-18. |
| **55.**    Mr. Iron Wing testified that at about the time he leased the Q50 on November 11, 2013, the sales staff at Park Place Infiniti told him that the Apps would be available about a month later. | Iron Wing Dep. 79:5-80:2. |
| **G.    Nissan's Representations About InTouch.** | |
| **56.**    From January 14, 2013 until August 1, 2013, Infiniti maintained an online microsite dedicated to the Q50 that referenced the Apps. | Ex. 17 at 7. |
| **57.**    Beginning at least as early as the July 2013 Q50 brochure and continuing until the Apps became available, Nissan consistently indicated that the Apps were not yet | *E.g.*, Ex. 20, Q50 Brochure at 17; Ex. 23, Car and Driver Ad, Oct. 2013; Ex. |

[PROPOSED] UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

Case No. 2:15-CV-01848 AB (MANx)

| | |
|---|---|
| available for use, often using the phrase "late availability." During that time, Nissan also consistently stated that "[n]ot all app features [were] available for all models." | 30, Car and Driver Ad, Feb. 2014; Infiniti website, Compl. ¶ 5:9, 17; Ex. 22, Floorstand, Aug. 2013 – March 2014, at 2 (cited in Ex. 17 at 21) |
| **58.**     The Q50 brochure said, "This brochure is intended for general descriptive and informational purposes only. It is subject to change and does not constitute an offer, representation or warranty (express or implied) by Nissan North America, Inc.  Interested parties should confirm the accuracy of any information in this brochure as it relates to a vehicle directly with Nissan North America, Inc., before relying on it to make a purchase decision.  Nissan North America, Inc., reserves the right to make changes, at any time, without prior notice, in prices, colors, materials, equipment, specifications, and models and to discontinue models or equipment. Due to continuous product development and other pre- and post-production factors, actual vehicle, materials and specifications may vary from this brochure . . .   Availability and delivery times for particular models or equipment may vary." | Ex. 20 at 17, 17.3. |
| **59.**     As Q50's August 2013 start of sales drew near, Nissan added a new Q50 landing page to its website that provided notice that the Apps had "Expected Fall 2013 Availability." On August 15, 2013, Nissan asked dealers to "set consumer expectations for connected services availability."    In that | Ex. 17, Marketing Initiatives, July 10, 2014 at 8; Cert. Mem. 6:20-21; Ex. 21 at 1, 4, 5; Compl. ¶ 18. |

**13**

| | |
|---|---|
| communication, Nissan indicated that it planned to make the Apps available a via software update "currently expected to be [available] Fall 2013." That communication cited from the then-current version of the InTouch FAQ on its website also indicating that the update was "currently expected to be Fall 2013" and "planned for Fall 2013." | |
| 60.     In October 2013, Nissan began attaching sleeves to the visors of Q50s indicating that the Apps had "Expected Fall 2013 Availability." Nissan also shipped visor sleeves to dealers to install in the Q50s that dealers already had in inventory. By December 2013, Nissan was no longer installing those visor sleeves before shipping the cars to dealers. | Ex. 17 at 15; Ex. 25, Email, Dec. 5, 2013 at 2; Pls.' Cert. Mem. 7:21-23. |
| 61.     By January 2014, Nissan was using a variety of media to announce to customers, dealers, and others that, while it was "still diligently working" on the Apps, when the Apps would "be available ha[d] not yet been determined." This information was available online, including on third-party user discussion forums and the U.S. Department of Transportation's National Highway Traffic Safety Administration website. Until Nissan knew that the Apps would be available in September 2014, Nissan continued announcing that the Apps' availability date "ha[d] not been determined." | *E.g.,* Ex. 29 at 24; Ex. 32 at 1; Ex. 31, Ex. 26 at 1-2; ITB14-0004a, Feb. 14, 2014, at 24; Ex. 27, Forum Post, Q50SSS, Jan. 13, 2014, at 1; Ex. 29 at 24; Ex. 31 at 24; Ex. 33, Forum Post, FolsomDude, Sept. 18, 2014, at 1 (cited in Compl. ¶ 30). |
| 62.     By January 2014, Nissan had updated nearly "all areas of the website" to reflect that it did not know when the Apps would be available. | Ex. 28, Email, Jan 17, 2014, at 1, 3. |

| | |
|---|---|
| **63.** Nissan removed from circulation no later than May 8, 2014—and in many cases earlier—all the materials that specifically referenced the Apps that Plaintiff's expert Dr. Calder identifies in his report.  Dr. Calder cites the following representations that mentioned the Apps specifically: the pre-launch microsite (removed August 1, 2013); two portions of Nissan's website (removed May 8, 2014); a digital PDF (removed May 1, 2014); the visor sleeve (removed c. December 2013); a letter sent to new owners (removed April 14, 2014); and digital magazine content (removed December 31, 2013). | Calder Report ¶ 7; Ex. 17 at 7, 9, 13-15, 19, 22; Ex. 25 at 2. |
| **64.** All the planned or actual representations by Nissan identified in Plaintiff's class certification briefing that specifically referenced the Apps were made months before May 8, 2014 and/or removed by May 8, 2014.  Plaintiffs' Memorandum cites the following representations that reference the Apps specifically: January 14, 2013 Infiniti Facebook post (4:23-24) (posted Jan. 14, 2013); planned default screen for Apps (7:15-20) (planned as of April 6, 2013); interim brochure (7:23-25) (replaced late July 2013); brochure (7:23-25) (released late July 2013); pre-launch microsite (4:24-25) (removed Aug. 1, 2013); pre-launch promotional events and demonstrations (5:21-22) (finished before Aug. 2013 launch); September & October 2013 magazine ads (8:2-15) (concluded Oct. 2013); website as of January 2014 (5:1-17) (occurred Jan. 2014); January 2014 Consumer Electronics Show (4:23-24) (occurred Jan. 2014); | Pls.' Cert. Mem. 4:16-20 (Jan. 2014 Consumer Electronics Show), 4:23-24 (Jan. 14, 2013 Infiniti Facebook post), 5:1-17 (Jan. 2014 website), 5:21-22 (pre-launch promotional events and demonstrations), 7:15-20 (planned default screen for Apps); Ex. 17 at 7 (pre-launch microsite), 8 (website generally), 13 (online interactive demonstration/simulator), 17 (interim brochure), 18 |

| | |
|---|---|
| January & February 2014 magazine ads (8:15-18) (concluded Feb. 2014); website generally (5:26-6:26) (text removed by Mar. 6, 2014, images by Mar. 17, 2014); Q50 floorstand (7:13-15) (removed March 2014); online interactive demonstration (6:27-7:6) (removed May 8, 2014).  Plaintiff's Reply mentions some of the materials indicated above but does not cite new materials. | (brochure); 21 (floorstand), 24 (Sept. & Oct. 2013 magazine ads), 25 (Jan. & Feb. 2014 magazine ads); Pls.' Cert. Reply 10:1-12. |
| **65.**   The so-called Monroney stickers that were intended to be displayed in the windows of all new Q50s available for sale or lease by dealers did not refer to the Apps specifically but did refer to the InTouch Apps.  In its entirety, the text about the InTouch Apps reads, "Infiniti InTouch Apps." | Ex. 18, Sample Q50 Monroney Label at 1; Pls.' Cert Mot. 7. |

### H.   New Vehicle Limited Warranty

| | |
|---|---|
| **66.**   The 2014 New Vehicle Limited Warranty ("Limited Warranty") applicable to the Q50 "covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Infiniti vehicle supplied by Infiniti." The Limited Warranty states, "Infiniti does not authorize any person to create for it any other warranty, obligation or liability in connection with this vehicle." | Ex. 38, Limited Warranty, at 5; *see also* Compl. ¶¶ 67, 112-13 (citing Limited Warranty). |

### I.   Dr. Calder's Report

| | |
|---|---|
| **67.**   Dr. Calder opines that Nissan's "entire marketing strategy [for the Q50] was to use the Advertised Apps/Functions to attract consumers who might not otherwise have purchased the Q50." | Calder Report ¶ 4; Ex. 10; Calder Dep., Jan. 17, 2017, at 102:7-16. |
| **68.**   Dr. Calder testified that he had not done any analysis of how or whether Nissan had promoted the non-Apps | Calder Dep. 242:2-12. |

| | |
|---|---|
| features of the Q50 such as the new platform, the new styling, or the new mechanical and safety features. | |
| 69.    Dr. Calder opines that customers likely were "heavily influenced" by Nissan's statements about the Apps but testified that he could not estimate how many people likely were influenced by the Apps or by Nissan's statements about them. | Calder Report ¶ 9; Calder Dep. 97:21-99:8, 100:4-7, 174:8-12. |
| 70.    Dr. Calder opines that "consumers valued being able to benefit from Internet services such as email search and Facebook and Pandora in their automobiles" and that "[c]onsumers would have been especially receptive to InTouch music streaming." | Calder Report ¶¶ 10, 12. |
| 71.    Dr. Calder testified that he could not define the popularity of the Apps in "an exact quantitative way." | Calder Dep. 31:16-23. |
| 72.    Dr. Calder's testified that, contrary to his report, when given a list of 10 potential features, only about 22% of U.S. consumers contemplating the purchase of any car chose the ability to use smartphone apps via a vehicle infotainment system as one of their top four features of interest.  His report put that figure at 35%. | Calder Dep. 179:8-20, 181:15-17, 182:19-24; Calder Report ¶ 11; *see* Ex. 41 at 3. |
| 73.    Dr. Calder testified that he considered Pandora to be "extremely popular" but that he would not attempt to estimate what percentage of the population used it because "the ordinary understanding of the word 'extremely,' . . . doesn't require the specification of an exact rate" and that he did not know the relevant information. | Calder Dep. 33:20-36:13. |
| 74.    Dr. Calder testified that he considered iHeartRadio to | Calder Dep. 38:14-40:15. |

[PROPOSED] UNCONTROVERTED FACTS AND
CONCLUSIONS OF LAW

Case No. 2:15-CV-01848 AB (MANx)

| | |
|---|---|
| be "one of the more popular [music] streaming services" but that he did not have "numerical values" as to how many people used either iHeartRadio specifically or music streaming services generally. | |
| **75.**    Dr. Calder testified that he considered Facebook to be "[e]xtremely popular" but did not have any numerical information about how many people in the United States use Facebook or how popular it is in comparison to iHeartRadio and Pandora. | Calder Dep. 45:20-46:9. |
| **76.**    Dr. Calder opines that "any failure of the advertised apps/functions must have substantially compromised the value of the Q50 automobile to buyers." | Calder Report ¶¶ 4, 18. |
| **77.**    Dr. Calder testified that in his report he did not try to place a dollar value on "any failure of the advertised apps/functions" and that he could not do so. | Calder Report ¶¶ 4, 18; Calder Dep. 109:20-23, 110:20-111:7. |
| **78.**    Dr. Calder testified that in his report he treated the existence of "any failure" of the Apps as a subjective conclusion by the individual consumer that Nissan did not "deliver on the brand promise." | Calder Dep. 116:1-8, 117:7-14. |
| **79.**    Dr. Calder testified that the Early Buyer Study showed that 15% of Q50 customers were either somewhat or very dissatisfied with their Q50s and that 3% of Q50 customers indicated both that they were dissatisfied and that their dissatisfaction involved the lack of "promised features," including the Apps. | Calder Dep. 219:19-220:3, 221:12-15. |
| **80.**    Dr. Calder testified that "by definition, there's no failure" as to the relevant features where a company delivers | Calder Dep. 118:6-16. |

| | |
|---|---|
| those features as promised.  He testified that this would include a circumstance where Facebook and Google Search "were the only things promised" and Nissan delivered them. | |
| **81.**    Dr. Calder testified he had a "general understanding that there were changes in specifics" in Nissan's statements about the Apps over time but that he had "not done a detailed analysis of that" and could not identify the changes.  He testified that analyzing such changes "didn't seem necessary for the point [he was] making." | Calder Dep. 164:7-19. |
| **82.**    Dr. Calder testified that his analysis of the impact that Nissan's statements had on consumers assumed that where a company initially states that a product offers feature X, its statement continues to influence consumers even where the company later explicitly announces that feature X is not available on that product. | Calder Dep. 166:21-167:14. |
| **83.**    In preparing his report, Dr. Calder did not review data involving enrollment for or usage of the Apps, including Eric Weisinger's deposition testimony on that topic and the portions of Mr. Weisinger's November 11, 2016 declaration regarding that topic.  Dr. Calder's report does not address Apps enrollment or usage.  Dr. Calder is confident that the opinions expressed in his report would not change if he were to review that data. | Calder Dep. 230:18-231:17; *see generally* Calder Report; *see* Weisinger Dep. 143:19-147:8; Weisinger Decl. ¶¶ 11-14 & Ex. 3-A ¶¶ 11-14. |

## II.   Conclusions of Law

### A. Summary Judgment Standard And Burdens.

**84.**    Summary judgment is proper where the evidence, viewed in the light most

favorable to the non-moving party presents no genuine issue of material fact and supports judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists only when "a reasonable jury could return a verdict [in favor of] the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**85.** "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009); *see also Celotex*, 477 U.S. at 322. "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *Stefanchik*, 559 F.3d at 929. The moving party may establish the absence of a genuine issue of material fact by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

### B.   App Enrollment And Usage Data.

**86.** Nothing in Rule 26(e) of the Federal Rules of Civil Procedure bars consideration of the apps enrollment and usage data offered by Nissan as Exhibits 5 and 6 to the Enfield Declaration in support of Nissan's motion for partial summary judgment because Nissan did not fail to supplement a disclosure or discovery response in a timely manner.

### C.   Relationship Between Named Plaintiffs' Claims And Class Claims.

**87.** Where the sole representative plaintiff for a given claim cannot survive summary judgment on that claim, neither can the putative class. *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, No. 13-CV-01180-BLF, 2014 WL 4774611, at *4 (N.D. Cal. Sept. 22, 2014).

**88.** Of the named plaintiffs, only Mr. Rafofsky could represent a California class, and only Mr. Iron Wing could represent a Nevada class. *E.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (holding that "each class member's

consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place").

### D.  Nissan Did Not Breach Any Contract.

**89.**  A contract can exist only where the parties "reach mutual assent or consent on definite or complete terms" regarding "all particulars essential to [the contract's] enforcement."  *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155. (N.D. Cal. 2007) (California law); *accord Wilson v. KRD Trucking W.,* No. 2:10-CV-00163-KJD, 2012 WL 1900941, at *3 (D. Nev. May 24, 2012) (Nevada law).

**90.**  A lack of competent evidence showing "the intention of the parties in material particulars" with sufficient clarity to define "the scope of the duty and limits of acceptable performance" renders any purported contract void and unenforceable. *Netbula*, 516 F. Supp. at 1155.

**91.**  There is no evidence establishing that any Nissan dealership was Nissan's agent for the purpose of entering into contract or warranty and no reason to presume such a relationship.  *Herremans*, 2014 WL 5017843, at *6 (C.D. Cal. Oct. 3, 2014).

**92.**  Neither the named Plaintiffs nor any member of the putative classes entered into a contract (1) with Nissan (2) about the Apps with sufficiently definite terms to be enforceable.

**93.**  Under California's and Nevada's Statutes of Frauds, contracts for sale of goods for more than $500 are unenforceable unless they are in writing and signed by the party to be charged.  Cal. Com. Code § 2201(1); N.R.S. § 104.2201.  There is no evidence establishing the existence of any such contract in connection with the sale of a Q50 that includes terms about the Apps.

**94.**  Under the Nevada Statute of Frauds, lease contracts for payments totaling $1,000 or more are unenforceable unless they are in writing and signed by the party to be charged.  N.R.S. § 104A.2201.  There is no evidence establishing the existence of any such contract in connection with the lease of a Q50 that includes terms about the Apps.

### E.    Nissan Did Not Violate the NDTPA.

**95.**    To prevail on a claim under the NDTPA, a private plaintiff must show "(1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff." *Picus v. Wal-Mart Stores, Inc*., 256 F.R.D. 651, 658 (D. Nev. 2009).

**96.**    Under the NDTPA, substantiating a claim of misrepresentation requires actual reliance by the plaintiff. *Id.*

**97.**    There is no evidence that Mr. Iron Wing or any member of the putative Nevada class relied on any specific misrepresentation.

**98.**    Under the NDTPA, misrepresentation claims generally require a knowing misrepresentation. *See* N.R.S. § 598.0915.

**99.**    There is no evidence that Nissan made a knowing misrepresentation either to Mr. Iron Wing or to any member of the putative Nevada class.

**100.**    Mr. Iron Wing cannot show that he saw any specific representation or omission by Nissan that was knowingly false or misleading because he cannot identify any specific representation or omission by Nissan. *See Simon v. Bank of Am., N.A.*, No. 10-CV-00300-GMN-LRL, 2010 WL 2609436, at *9 (D. Nev. June 23, 2010).

### F.    Plaintiffs Have No Claims As To Facebook, Google Search, Email, Or Calendar.

**101.**    Because Nissan provided Facebook, Google Search, Email, and Calendar and did not guarantee a delivery date for those four apps, Nissan is not liable as to those apps under any of Plaintiffs' asserted causes of action.

### G.    Summary Judgment To Nissan Is Proper On Plaintiffs' Class Claims.

#### i.    Most Customers Suffered No Injury.

**102.**    Nevada and California express warranty law, the CLRA, the UCL, and the NDTPA all require establishing an injury. *Houston v. Medtronic, Inc.*, 957 F. Supp. 2d 1166, 1181 (C.D. Cal. 2013); *Scovil v. Medtronic Inc.*, No. 2:14-CV-00213-APG, 2015 WL 880614, at *11-12 (D. Nev. Mar. 2, 2015); *Mazza*, 666 F.3d 581 at 594; *Picus*, 256

F.R.D. at 658 (NDTPA).

**103.**   Customers who chose not to enroll for the Apps did not want the Apps and could not have been injured by the Apps' unavailability.

**104.**   Customers who did not own compatible smartphones and therefore could not use the Apps under any circumstances could not have been injured by the Apps' unavailability.

### ii.   The Alleged Misrepresentations Caused Most Customers No Injury.

**105.**   Plaintiffs' causes of action under breach of warranty and consumer protection statutes require that Nissan's alleged misrepresentations caused them injuries. *Houston*, 957 F. Supp. 2d at 1181 (C.D. Cal. 2013); *Scovil*, 2015 WL 880614 *11-12; *Mazza*, 666 F.3d at 594; *Picus*, 256 F.R.D. at 657.

**106.**   Customers who did not enroll to use the Apps did not consider the Apps material and therefore could not have considered representations about them material.

**107.**   Without materiality, there can be no presumption of causality under the CLRA. *See In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 134 (2009).

**108.**   Without materiality, there can be no presumption of causality under the UCL because an immaterial representation is not likely to deceive a reasonable consumer.

**109.**   An alleged misrepresentation to which a customer was never exposed cannot cause that customer any injury, nor can it justify a presumption of causation.  *E.g.,* *Mazza*, 666 F.3d at 594; *see also Picus*, 256 F.R.D. at 659.

**110.**   Because customers who bought or leased their Q50s after May 2014 were not exposed to any representations about the Apps, they could not have been injured by any misrepresentation about the Apps.

### iii.   Awarding Relief To The Proposed Classes Would Violate Article III.

**111.**   "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not," which means that a factfinder cannot find liability as to both injured and uninjured class members. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.

Ct. 1036, 1053 (2016) (Roberts, C.J., concurring).

**112.**   The nature of Plaintiffs' proposed class definitions means that, if the classes were to prevail, the Court would have to order relief to class members who suffered no injury, which would violate Article III.  *See id.*

**113.**   Plaintiffs' proposed class definitions are such that, if the classes were to prevail, large numbers of class members—indeed, a majority of class members—would receive relief even though they suffered no injury, which would also violate Article III.  *See id.*

### H.   Non-Human and Non-Household Customers Have No Claims Under the CLRA.

**114.**   Only "an individual who seeks or acquires . . . goods or services for personal, family, or household purposes" has standing under the CLRA.   Cal. Civ. Code. § 1761(d).   All non-human persons, as well as any individuals who use the Q50 primarily for business, cannot state a claim under the CLRA.  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

### I.   Plaintiffs May Not Seek CLRA Damages.

**115.**   Plaintiffs may not seek damages under the CLRA.  Cal. Civ. Code § 1782(a); *Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 949 (S.D. Cal. 2007).

### J.   Injunctive And Declaratory Relief Would Not Be Proper.

**116.**   Article III requires that plaintiffs seeking injunctive or declaratory relief show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" and that they are "realistically threatened by a *repetition* of the violation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006).  Here, there is no realistic threat of repetition that injunctive or declaratory relief would likely redress.

1

2    Dated:  January 30, 2017                    Respectfully submitted,

3                                          By:   /s/ Peter J. Brennan

4                                                PETER J. BRENNAN

5                                                *Counsel for Nissan North America, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 30, 2017, I caused the foregoing **[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW FOR NISSAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the Court's ECF/CM system, thereby serving all counsel of record.

/s/ Jonathan A. Enfield
JONATHAN A. ENFIELD